UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MEDGRAPH, INC.,


                                        Plaintiff,

                                                        DECISION AND ORDER

                                                        09-CV-6610L


                        v.

MEDTRONIC, INC.,



                                        Defendant.
_____


        Patent litigation often involves complex, abstruse matters, since the patents at issue often

relate to cutting-edge technology.  The case law governing such litigation can be similarly

complex.  This case is one example.

        This case involves two patents concerning technology relating to health care.  Many of

the legal issues involved center on a particular case that has worked its way to the Federal Circuit

and the Supreme Court, and back again to the Federal Circuit:  *Akamai Technologies, Inc v.

Limelight Networks, Inc.* ("*Akamai*").  The lengthy history of this litigation is set forth in detail

below, and involves appeals, remands, one *en banc* decision, and more than one split decision

among the deciding judges.

Despite that extensive history, the relevant, controlling law on the issues presented in the instant case is clear.  Based on that authority, and the facts of this case, defendant's motion for summary judgment must be granted.  The complaint is therefore dismissed.

## BACKGROUND

Medgraph is a New York corporation, which, according to the complaint, is "in the business of commercializing its patented inventions by offering for sale and licensing to third parties the methods and systems claimed in its patents ... ."  Dkt. #26 ¶ 2.  Defendant Medtronic states that it "develops, manufactures, and markets a variety of medical devices and systems including therapies and solutions for ... diabetes ... ."  Defendant's Statement of Undisputed Material Facts (Dkt. #135-1) ¶ 15.

The two patents in suit, which are owned by plaintiff, are U.S. Patents No. 5,974,124 ("'124 Patent") and No. 6,122,351 ("'351 Patent").  Both patents are entitled "Method and system aiding medical diagnosis and treatment."  The '351 Patent is a continuation in part of the '124 Patent.  Both patents relate to the electronic collection and storage of patient data, and the transmission of such data to physicians and other health care professionals.  *Id.*

The '124  and '351 patents both claim a "method for improving and facilitating diagnosis and treatment of patients having medical conditions requiring long-term profiles of specific variables ... ."  The '124 Patent sets forth fifteen method claims, numbered 1 - 15, as well as a

system claim, numbered claim 16.  The '351 Patent contains a single method claim.[1]  In many respects, the two patents share nearly identical language, and the '351 method claim mostly tracks the language of Claim 1 of the '124  patent; to the extent that they differ, those differences are not materially significant for purposes of this Decision and Order.

In layman's terms, both patents relate to a method whereby medical practitioners or patients take readings of certain variable data (such as diabetes patients' blood sugar levels), input the data into a computer, and transmit the data to a central storage device, from which the data can be accessed by medical professionals who have been treating the patient.  The '124 patent also claims a system that allows that method to be performed.

In other words, the method and system claimed by the patents enable patients and their physicians to store patients' medical data in a way that allows them, as well as other physicians and medical personnel, to access that data from a remote location, using a computer.

More specifically, Claim 1 of the '124 Patent claims:

A method for improving and facilitating diagnosis and treatment of patients having medical conditions requiring long-term profiles of specific variables, said method including the steps of

using at least one measuring device, periodically taking a measurement of at least one medically important variable that has been identified for a patient from a body of said patient;

---

[1]The differences between method and system claims are addressed, as relevant to the facts of this case, below.  In general, however, a "method claim is directed to specific steps being performed.  In other words, a method claim recites what is being performed.  A system claim, on the other hand, is directed to what is doing the performing or the components that are performing the steps of a method."  "Cloud Computing and the Doctrine of Joint Infringement: 'Current Impact' and Future Possibilities," 11 *John Marshall Rev. Intell. Prop.* 673, 679-80 (Spring 2012).

ensuring said patient is separated from said at least one measuring device after taking each said measurement;

inputting said at least one medically important variable as raw data into a primary computer system after said step of ensuring said patient is separated and recording said raw data in a mass storage device integrated with said primary computer system;

compiling said raw data as data for said patient using the primary computer system, said data representing a history of values for said at least one medically important variable for said patient;

receiving a request for data of one of said patients from by a medical practitioner that is treating said one of said patients; and

outputting requested data for said one of said patients in the form of at least one of a chart and a graph to said medical practitioner;

said step of inputting comprising one of

transferring said raw data to a remote computer comprising an ordinary general purpose personal computer, then transferring said raw data to said primary computer;

telephoning an automatic telephone interface and employing one of speech recognition and touch-tone recognition software to input said raw data into said primary computer; and

telephoning a live receptionist, speaking the raw data to said live receptionist for entry into said primary computer.

Dkt. #26-1 at 8.  The '351 Patent sets forth a similar claim, with some differences that need not be elaborated upon here.  *See* Dkt. #26-2 at 9.

Claim 16 of the '124  Patent claims a "system for improving and facilitating diagnosis and treatment of patients having medical conditions requiring long-term profiles of at least one predetermined medically important variable ... ."  Dkt. #26-1 at 9, col. 10, lines 24-27.  That claimed system allows the method claimed in Claims 1-15 to be performed.

What is alleged to infringe here is Medtronic's "CareLink System," a software- and internet-based system in which diabetes patients can upload blood glucose readings to Medtronic's central computer, which is located in Minnesota. Those readings can then be converted into graphs and charts that are accessible by both the patient (as part of Medtronic's "Carelink Personal" system) and the patient's physician (as part of the "Carelink Pro" system).

The amended complaint (Dkt. #26) sets forth six counts: (1) direct infringement of Claims 1, 2, 3, 5, 11 and 16 of the '124 Patent; (2) induced infringement of those claims in the '124 Patent; (3) contributory infringement of those claims in the '124 Patent; (4) direct infringement of the '351 Patent; (5) induced infringement of the '351 Patent; and (6) contributory infringement of the '351 Patent.

## DISCUSSION

### I. General Principles

### A. Direct Infringement

Section 271(a) of the Patent Act, 35 U.S.C. § 271(a), provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Such infringement is commonly referred to as "direct" infringement.

All but one of the claims at issue in this case are "method" claims. "A 'method' in a claim, one of the most common and basic terms of patent drafting, is a 'process,' and 'method' and 'process' have a clear, settled meaning: a set of actions, necessarily taken over time."

*Nassau Precision Casting Co., Inc. v. Acushnet Co., Inc.*, 566 Fed.Appx. 933, 939 (Fed. Cir. 2014) (citations omitted).

"To [directly] infringe a method claim, a person must have practiced all steps of the claimed method." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009), *cert. denied*, 560 U.S. 935 (2010).  A single actor–either the defendant or someone acting under the defendant's direction or control–must perform each step of the claimed method.  *See Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 709 F.3d 1348, 1353 (Fed. Cir. 2013) ("direct infringement requires a single party to perform every step of a claimed method"); *Medisim Ltd. v. BestMed LLC*, ___ F.Supp.2d ___, 2012 WL 5954757, at *18 (S.D.N.Y. Nov. 28, 2012) ("In order to directly infringe a method claim, a party must perform every claimed step") (citing *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993)).

With respect to system claims, a party may be held liable for direct infringement only if the party makes or sells the "complete invention."  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n. 2 (Fed. Cir. 2000).  In addition, "[t]o prove literal infringement, the patentee must show that the accused device contains *each and every limitation* of the asserted claims."  *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1215 (Fed. Cir. 2014) (quoting *Presidio Components, Inc. v. Am. Tech. Ceramics, Corp.*, 702 F.3d 1351, 1358 (Fed. Cir. 2012)).  *See also Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,* __ F.Supp.3d __, 2015 WL 1476399, at *16 (N.D.Cal. Mar. 31, 2015) ("To establish literal infringement, all of the elements of the claim, as correctly construed, must be present in the accused system") (quoting *NetWord, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001)).

**B. Indirect Infringement**

In addition to direct infringement, the patent statutes also create liability for so-called indirect infringement, which generally falls into two categories:  induced and contributory infringement.    Both types are alleged here, both as to the method claims and the one system claim.

Subsection (b) of 35 U.S.C. § 271 provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  "In contrast to direct infringement, liability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'"  *Commil USA, LLC v. Cisco Systems, Inc.*, __ S.Ct. __, 2015 WL 2456617, at *5 (2015) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, __ U.S. __, 131 S.Ct. 2060, 2068 (2011)).  *See also Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (To prove inducement of infringement, the patentee must "show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement") (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, __ U.S. __, 131 S.Ct. 2060, 2068 (2011)); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) ("To prove induced infringement, the patentee 'must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement'") (quoting *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010), *aff'd*, __ U.S. __, 131 S.Ct. 2238 (2011)).

Subsection (c) of § 271 deals with contributory infringement:

Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part

of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

To establish contributory infringement, the patent owner must show "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) (citing 35 U.S.C. § 271(c)).

To establish contributory infringement liability, the patent owner must also "show, among other things, that there are no substantial non-infringing uses." *Toshiba*, 681 F.3d at 1362 (citing 35 U.S.C. § 271(c)). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). "Like induced infringement, contributory infringement requires knowledge of the patent in suit and knowledge of patent infringement." *Commil USA*, 2015 WL 2456617, at *6 (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964)).


## C. *Akamai Technologies*

A full understanding of the procedural posture of this case and the relevant legal issues requires some familiarity with the decisions of the United States Supreme Court and the Court of Appeals for the Federal Circuit in the *Akamai Technologies* litigation. In 2010, the Federal Circuit issued a decision holding in part that "direct infringement [of a method claim] requires a single party to perform every step of a claimed method." *Akamai Technologies, Inc. v. Limelight*

-8-

*Networks, Inc.* ("*Akamai I*"), 629 F.3d 1311, 1318 (Fed. Cir. 2010).  The court in that case affirmed the district court's entry of judgment for the defendant Limelight notwithstanding a jury verdict for the plaintiff patent holder, on the ground that the defendant "did not perform all of the steps of the asserted method claims, and [because] the record contain[ed] no basis on which to attribute to Limelight the actions of its customers who carried out the other steps ... ."  *Id.* at 1314.

At the time that Medtronic first filed its motion for summary judgment in this action, *Akamai I* was good law.  In that motion, Medtronic relied in part on the "single actor rule," *i.e.*, the principle that a party cannot be held liable for indirect infringement unless some other, single actor has committed the entire act of direct infringement.  *See* Dkt. #132-9 at 10.

Afterwards, though, the Federal Circuit, sitting *en banc*, issued a second decision, overruling the panel decision in *Akamai I.  Akamai Technologies, Inc. v. Limelight Networks, Inc.* ("*Akamai II*"), 692 F.3d 1301 (Fed. Cir. 2012).  In a 6-5 ruling, the majority in *Akamai II* held that "all the steps of a claimed method must be performed in order to find induced infringement, but that it is not necessary to prove that all the steps were committed by a single entity."  *Id.* at 1306.  In other words, the court held, to establish a claim for induced infringement, it is not necessary to prove that any particular entity could be held liable for direct infringement.  *See Move, Inc. v. Real Estate Alliance Ltd.*, 709 F.3d 1117, 1123 (Fed. Cir. 2013) ("all the steps of a claimed method must be performed in order to find induced infringement, but ... it is not necessary to prove that all the steps were committed by a single entity") (citing *Akamai II*, 692 F.3d at 1307).  Such infringement, by more than one party, is sometimes referred to as "divided infringement."

In the wake of *Akamai II*, Medtronic requested, and was granted, leave to file an amended motion for summary judgment (Dkt. #135). Medtronic's amended motion papers addressed *Akamai II*, although Medtronic took the position that even under *Akamai II*, Medgraph had failed to show indirect infringement, because Medgraph had not demonstrated that any entity or entities, either singly or in combination with each other, had performed all of the steps of the claimed invention. *See* Dkt. #135-11 at 7 (noting that under *Akamai II*, "indirect infringement is necessarily predicated on actual performance of each and every step of the asserted method by one or more entities ...").

Following *Akamai II*, however, the Supreme Court granted certiorari, and reversed the Federal Circuit's *en banc* decision. The Supreme Court held that a defendant may not be held liable for inducing infringement of a patent under 35 U.S.C. § 271(b) when no single actor has directly infringed the patent under § 271(a). *Limelight Networks, Inc. v. Akamai Technologies, Inc.* ("*Akamai III*"), __ U.S. __, 134 S.Ct. 2111, 2115 (2014).

In reaching that conclusion, the Court assumed, without deciding, that the Federal Circuit's earlier decision in *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), was correct. In *Muniauction*, the court held that "direct infringement requires a single party to perform every step of a claimed method, " *id.* at 1329, and that this requirement is satisfied even though the steps are actually undertaken by multiple parties, if a single defendant "exercises 'control or direction' over the entire process such that every step is attributable to the controlling party." *Id.*

In its decision, the Supreme Court stated that

-10-

> the reason [defendant] Limelight could not have induced infringement under § 271(b) is not that no third party is liable for direct infringement; the problem, instead, is that no direct infringement was *committed*. *Muniauction* (which, again, we assume to be correct) instructs that a method patent is not directly infringed–and the patentee's interest is thus not violated–unless a single actor can be held responsible for the performance of all steps of the patent. Because Limelight did not undertake all steps of the '703 patent and cannot otherwise be held responsible for all those steps, respondents' rights have not been violated.

*Id.* at 2118-19. The Court added that (1) there is no direct infringement of a method patent where the performance of all the steps of the claimed method is not attributable to any one person or entity, and (2) since in that circumstance there is no direct infringement, there can be no inducement of infringement. *Id.* at 2117.

The Supreme Court expressly declined to review the merits of the Federal Circuit's *Muniauction* rule for direct infringement under § 271(a). The Court stated that the appeal before it was "clearly focused on § 271(b), not § 271(a)," and that the issue presented–whether "a defendant may be held liable for inducing patent infringement under 35 U.S.C. § 271(b) even though no one has committed direct infringement under § 271(a)"–presupposed that the defendant had not committed direct infringement under § 271(a). Because its decision on the § 271(b) question necessitated a remand to the Federal Circuit, the Court added that "on remand, the Federal Circuit will have the opportunity to revisit the § 271(a) question if it so chooses." *Id.* at 2120.

Following *Akamai III*, with leave of court, Medtronic submitted a supplemental brief in this case, asserting that the Supreme Court's decision in *Akamai III* "restores Medtronic's original (previously withdrawn) argument that it is not liable for inducing infringement of the method claims of the '124 and '351 patents because no single actor, or group of actors under a

single actor's direction or control, performs each and every step of the asserted methods."  Dkt. #154 at 1.

Medgraph's arguments have also changed in response to the various *Akamai* decisions. Medgraph's initial papers in opposition to Medtronic's motion (which were filed when *Akamai II* was controlling) focused almost exclusively on its claims of indirect infringement.  At oral argument, which took place before the Supreme Court handed down the *Akamai III* decision, counsel for Medgraph confirmed that Medgraph was withdrawing its claims of direct infringement, as to the method claims.  *See* Transcript (Dkt. #151) at 3.  Medgraph has stated that "after *Akamai* II Medgraph could no longer assert direct infringement under §271(a)." Medgraph's Supp. Brief (Dkt. #155) at 9.

After the Supreme Court's reversal of *Akamai II*, however, Medgraph changed its position concerning direct infringement.  Medgraph concedes that the Supreme Court's decision in *Akamai III* has "undercut" its position as to induced infringement, Dkt. #155 at 5, but Medgraph now asserts direct infringement by Medtronic of the method claims, under 35 U.S.C. § 271(a).  Medgraph states that it "has now changed its position and asserts direct infringement by Medtronic of the *method* claims," under § 271(a).  *Id.* at 6.

Medgraph did so based on what it saw as the Supreme Court's invitation in *Akamai III* to the Federal Circuit to revisit the *Muniauction* holding.  Specifically, Medgraph argued that the Federal Circuit on remand would likely adopt the position taken by Circuit Judge Pauline Newman in her dissent in *Akamai II*, in which she argued that "[t]he court should acknowledge that an all-purpose single-entity requirement is flawed, and restore direct infringement to its

status as occurring when all of the claimed steps are conducted, whether by a single entity or in interaction or collaboration."  692 F.3d at 1336.

At the outset, it is worth pointing out that contrary to Medgraph's assertions, *Akamai III* did not effect a change in the law with respect to direct infringement.  Where the Supreme Court and the majority in *Akamai II* parted ways was over the issue of indirect infringement. Despite Medgraph's between-the-lines reading of *Akamai III* as hinting that the Federal Circuit should rethink its holding in *Muniauction*, and despite Medgraph's speculative assertion that the Court of Appeals would likely do so, the fact is that the Supreme Court in *Akamai III* assumed that *Muniauction* remained good law, and proceeded to decide the case before it on that basis. *See* 134 S.Ct. at 2117.

At any rate, it is unnecessary to guess what the Federal Circuit might do on remand, because the Federal Circuit has now spoken.  On May 13, 2015, a panel of that court issued yet another decision in *Akamai*, adhering to the single-actor rule enunciated in *Muniauction*, and "again conclud[ing] that because [defendant Limelight] did not perform all of the steps of the asserted method claims of [the patent-in-suit] and because the record contains no basis on which to impose liability on Limelight for the actions of its customers who carried out the other steps, Limelight has not directly infringed the '703 patent under § 271(a)."  *Akamai Technologies, Inc. v. Limelight Networks, Inc.* ("*Akamai IV*"), __ F.3d __, 2015 WL 2216261, at *1 (Fed. Cir. May 13, 2015).

The court set forth an extensive review of the legal principles concerning "divided infringement."  First, the court reiterated that "direct infringement liability of a method claim under 35 U.S.C. § 271(a) exists when all of the steps of the claim are performed by or attributed

to a single entity ... ." 2015 WL 2216261, at *1.  For method patent claims, the court stated,

"direct infringement only occurs when a single party or a joint enterprise performs all of the steps

of the process."  *Id.*

> The court then went on to address indirect infringement:
>
> When a party participates in or encourages infringement but does not directly infringe a
> patent, the normal recourse under the law is for the court to apply the standards for
> liability under indirect infringement.  However, indirect infringement requires, as a
> predicate, a finding that some party is directly liable for the entire act of direct
> infringement.  In circumstances in which one party, acting as "mastermind" exercises
> sufficient "direction or control" over the actions of another, such that those actions may
> be attributed to the mastermind, the combined performance of the steps of a method claim
> will directly infringe under § 271(a).

*Id.* (citations omitted).

The court in *Akamai IV* further stated that it remained bound by its prior holdings in

*Muniauction*, and *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), in

which the court held that "inducement of infringement requires a predicate finding of direct

infringement."  498 F.3d at 1380.  The court in *BMC* held that liability for "divided"

infringement requires proof that one party acted as the "mastermind" and controlled or directed

the other party's acts.  *Id.* at 1381.

In *Akamai IV*, the court held that "[b]ecause this case involves neither agency nor contract

nor joint enterprise, we find that Limelight is not liable for direct infringement."  2015 WL

2216261, at *1.  The court expressly adhered to the "mastermind" concept embodied in *BMC*.

*Id.*  Stating that "[t]here is no mutual agency or cooperation when parties act independently for

their own benefit, such as in arms-length seller-customer relationships," the court said that there

-14-

was no evidence before it of any "concert of action" between the defendant Limelight and its

customers.  *Id.* at *8.  Absent such evidence, the defendant could not be held liable.  *Id.*


## II. Method Claims in this Case

## A. Direct Infringement

Medtronic contends that it is undisputed that Medtronic does not, and cannot, directly

infringe the method claims at issue, *i.e.*, claims 1, 2, 3, 5 and 11 of the '124 patent, because

Medtronic does not, itself, perform the steps of the method claims.  As stated, those claims

generally involve taking measurements of patients' data with a device, and inputting those

readings into a computer.  Medtronic states that it does not provide, and has never provided, any

direct patient care; it simply manufactures and sells devices and systems.  It provides its

customers with instructions on how to use its systems, but it does not obligate anyone to do so.

As explained above, at one point in this litigation, Medgraph expressly stated that it was

not alleging direct infringement, and that it was withdrawing its claims of direct infringement as

to the method claims.  *See* Transcript (Dkt. #151) at 3.  Medgraph's more recent attempt to

backtrack from that position was based on its prediction that the Federal Circuit would overturn,

or at least modify, its prior holding in *Muniauction* concerning direct infringement of method

claims, and adopt a rule recognizing some sort of "collaborative" infringement.

That prognostication turned out to be erroneous.  The Federal Circuit has adhered to its

prior holdings in *Muniauction* and *BMC*.  The Federal Circuit's website also shows that the time

to file a petition for rehearing *en banc* has passed, with no petition filed.  *See* Fed. R. App. P.

35(c), 40(a)(1) (petition for *en banc* rehearing must be filed within 14 days after entry of judgment).

Thus, with respect to the law governing direct infringement, the legal landscape today is effectively the same as it was when Medgraph withdrew its direct-infringement claims as to the method claims.  It apparently did so in recognition of the lack of evidence of direct infringement. *See* Medgraph's Supp. Brief (Dkt. #155) at 9 (stating that Medgraph previously withdrew its direct-infringement claims because "[i]n the present case, more than one person, i.e., the patient or doctor, neither of whom is an agent of or under contractual obligation to Medtronic, is required to perform all of the steps of the method claims of the Patents-in-Suit").

There is no more evidence of direct infringement now than there was then.  There has been no showing that Medtronic itself directly infringed the method claims, or that it acted as a "mastermind" by controlling or directing anyone else's direct infringement of Medtronic's patents.

Just as the panel in *Akamai IV* was bound by *Muniauction* and *BMC*, *a fortiori* this Court is as well.  Medgraph's claims of direct infringement of the method claims are therefore dismissed.

## B. Indirect Infringement

The parties have over the course of this litigation expended a great deal of time and effort addressing the issue of indirect or induced infringement.  Much of the reason for that effort is attributable to the various decisions handed down in the *Akamai* case, as explained above.

Whatever the vagaries of that litigation may have been, the law in this area, for now at least, is clear.  The Federal Circuit's decision in *Akamai IV* lays out the governing principles quite thoroughly.

First, "[e]ncouraging or instructing others to perform an act is not the same as performing the act oneself and does not result in direct infringement."  2015 WL 2216261, at *1.  That matters here because "indirect infringement requires, as a predicate, a finding that some party is directly liable for the entire act of direct infringement."  *Id.*  Absent "a principal-agent relationship, a contractual relationship or ... circumstances in which parties work together in a joint enterprise functioning as a form of mutual agency," there is no predicate direct infringement, and hence no indirect infringement either.  *Id.*

In support of its claims, Medgraph has submitted evidence, through its expert, that a user of Medtronic's Carelink system *could* perform each of the steps contained in the method claims of the patents in suit.  *See* Declaration of Bryan P. Bergeron (Dkt. #141-29).  What is glaringly absent, though, is proof that any direct infringement has occurred, under the standards set forth in *Akamai III* and *IV* and the other controlling case law cited above.

Medgraph has also asserted (again, prior to *Akamai IV*) that evidence of "syncs," *i.e.*, instances of synchronization between a patient's doctor and CareLink's central computer, confirm the predicate direct infringement needed to sustain a claim of direct infringement under § 271(b).  Dkt. #141 at 12-13.  A sync occurs when a patient uploads data to the system and the patient's doctor downloads the data.  According to Medgraph, a sync "is the complete embodiment of the methods and system claimed in the Patents-in-Suit."  Medgraph's Brief (Dkt. #141) at 8.

As Medtronic has pointed out, however, the "sync" data do not show any particular instances of actual infringement.  The raw data could include instances in which a patient entered information (such as diet-related or other "lifestyle" information) that was indisputably outside the scope of the claimed invention.

In any event, this evidence relates to the concept of so-called divided infringement.  As explained above, under the governing case law, proof of divided infringement cannot give rise to a claim, absent some basis for vicarious liability, which is lacking here.  *Akamai IV*, __ F.3d at __, 2015 WL 2216261, at *6 ("the vicarious liability test includes, for example, principal-agent relationships, contractual arrangements, and joint enterprises"); *see also Mankes v. Vivid Seats Ltd.*, __ F.Supp.3d __, 2015 WL 847404, at *3-*4 (E.D.N.C. 2015) (stating that "[t]he controlling rule, consistently applied by the Federal Circuit, is where multiple parties perform all the steps of a claimed method, there is no direct infringement unless one party exercises control," and therefore dismissing plaintiff's claim of induced infringement as well), *petition for cert. docketed*, No. 15-1500 (Fed. Cir. Mar. 27, 2015).

In short, without some act of direct infringement, there simply cannot be any induced infringement.[2]  For the reasons stated above, there has been no showing of direct infringement

---

[2]While *Akamai II* is no longer good law, it is worth noting that even the *Akamai II* majority described the "principle[] that there can be no indirect infringement without direct infringement" as "well settled" and "uncontroversial."  692 F.3d at 1308.  It was over the application of that principle, rather than the principle itself, that the Supreme Court parted ways with the *Akamai II* majority.

here.  Medtronic is therefore entitled to summary judgment dismissing Medtronic's claims of

induced infringement.[3]


### III. System Claim in this Case

Claim 16 of the '124 Patent claims a "system for improving and facilitating diagnosis and

treatment of patients having medical conditions requiring long-term profiles of at least one

predetermined medically important variable ... ." Dkt. #26-1 at 9.  The claimed system

comprises:  (1) a "means for measure [sic] said at least one predetermined medically important

variable"; (2) a "means for inputting" that variable in the form of raw data into a computer; (3)

"software for coming said raw data as data for each patient" [sic]; (4) a "means for receiving a

request for data" from a medical practitioner; and (5) a "means for automatically outputting

requested data in response to receiving said request," in which "said means for measuring and

said means for inputting are operable independently from each other, such that, after obtaining a

measurement, a patient may be separated from said means for measuring during an inputting

operation by said means for inputting." *Id.*

In support of its motion for summary judgment, Medtronic focuses on the language

regarding a "means for inputting" data.  The patent states that this element

> compris[es] software and hardware enabling said primary computer system to operate as
> at least one of a web server, a dial-up host, a network server, and a telephone answering
> and data collection device whereby raw data can be communicated from a remote

---

[3]My ruling renders it unnecessary for the Court to address the issue of whether Medgraph
has shown the requisite intent on Medtronic's part to support a claim of induced infringement.
*See Akamai III*, 134 S.Ct. at 1308 (to be liable for induced infringement, alleged infringer must
have knowingly "caused, urged, encouraged, or aided" another party to directly infringe, with
"specific intent to encourage" that infringement).

computer proximate a patient comprising an ordinary general purpose personal computer and from an ordinary telephone wherein data is transmitted as one of spoken data and touch-tone data ... .

*Id.*, col. 10 lines 32-39.

Regarding the language, "from a remote computer ... and from an ordinary telephone," Medtronic takes the position that while the primary computer must be able to operate in at least one of the four specified modes (*i.e.*, a web server, a dial-up host, a network server, or a telephone answering and data collection device), the computer must be capable of receiving raw data from *both* a general purpose personal computer *and* an ordinary telephone, in all four modes. Medtronic argues that its CareLink system does not infringe this claim, because it is not capable of receiving patient data from an ordinary telephone.

Medtronic also notes that according to the patent, the "means for automatically outputting requested data in response to receiving said request for data" comprises

means to transmit said requested data in the form of at least one of a chart and graph generated from said data from said primary computer to a remote computer proximate said practitioner whereby said primary computer is one of a web server, a dial-up host, and a network server and means to transmit said requested data by facsimile through a fax-modem integrated with said primary computer ... .

*Id.*, col. 10 lines 53-60.

Medtronic interprets this language to mean that the system must include two distinct means of transmitting data. The first of these requires either an internet connection ("web server"), a modem-to-modem connection ("dial-up host"), or a network connection ("network server"). The second means to transmit requires a fax machine. In other words, according to Medtronic, Claim 16 requires the invention to be capable of transmitting data by means of a

-20-

computer *and* by fax.  Medtronic contends that the CareLink system cannot infringe the patent because it lacks a means of transmitting data by fax.

In response, Medgraph contends that the word "and" has in some cases been construed to mean "or."  Medgraph asserts that the '124  patent references both a "High Tech" (web-based computer system) and a "Low Tech" (telephone-based system) version of the claimed system.  According to Medgraph, a system that includes either of those is covered by the patent.

Medgraph is correct that courts have *sometimes* read "and" to mean "or."  In *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358 (Fed. Cir. 2008) ("*Ortho*"), the court held that a patent that used the conjunction "and" in describing certain chemical compounds did not require the simultaneous existence of both sets of compounds.  *Id.* at 1361.

What *Ortho* principally teaches, however, is that the construction of conjunctions like "and" and "or" must be based on the context in which those words are used.  In holding that "in the circumstances of this case, claim 1's use of the term *and* means *or*," the court analyzed the relevant claim language and stated that "as used in this claim, *and* conjoins mutually exclusive possibilities."  *Id.* at 1361, 1362.  The court further examined the "larger context that clarifies [the term *and*'s] meaning," specifically, the use of "and" in conjunction with certain other modifiers, and the patent's specification.  *Id.* at 1362.

Such indications are absent here.  Far from setting forth mutually exclusive means of inputting and outputting data, the patent emphasizes the versatility of the claimed invention; *see, e.g.*, '124  Patent (Dkt. #26-1) at col. 1, line 65 (stating that the patent provides "simple and versatile input and output" of information from a centralized database).  The patent envisions users using only one method at any given time, for obvious reasons; a user would have no need

to use more than one means, on any given occasion.  But the claimed invention, by its terms, is *capable* of receiving and sending data by *all* the means listed, not just one of them, and those means are in no way mutually exclusive.  *See id.* at col. 5, lines 26-28 ("All five avenues of data input can operate concurrently in a single system which is designed to fill every customer's need, including both patients and medical practitioners").

Medgraph contends that the patent claims a "high tech" system, operable through the internet by means of a web and internet server, and a "low tech" system, operable by means of a telephone and fax system.   The '124 Patent does mention both versions, using that terminology, in describing the preferred embodiment.  *Id.* at col. 6, lines 32-34, and Fig. 1.

Reading that description in context, however, it is clear that the claimed invention utilizes both systems.  As stated, the patent repeatedly emphasizes its versatility.  Not every reference in that regard relates to this particular issue, but the point is that the patent stresses throughout that the claimed invention is capable of being utilized in a variety of ways, using a variety of means. In addition to the cites quoted above, *see*, *e.g.*, *id.* at col. 5, lines 32-33 ("the primary computer may have any number of ports for accepting data"); lines 38-40 ("system 1 can thus accommodate a large population of patients under a variety of circumstances having a variety of needs and *capabilities*") (emphasis added).[4]

In general, when construing claim terms, courts should give those terms their ordinary, commonly accepted meaning.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir.2005) (en banc) ("Claim terms are generally given their ordinary and customary meaning as

---

[4]The patent refers to "system 1," but there does not appear to be any "system 2."  The patent states that "[t]he computer system 1 includes of [sic] data input means, data process and storage means, and data output means."  Dkt. #26-1 at 6, col. 3, lines 47-48.

understood by a person of ordinary skill in the art at the time of the invention"); *Chef America,*

*Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) (finding that the patent used

"ordinary, simple English words whose meaning is clear and unquestionable,' and that there was

"no indication that their use in this particular conjunction changes their meaning. They mean

exactly what they say").

The court may depart from the plain meaning of a term "1) when a patentee sets out a

definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of

the claim term either in the specification or during prosecution." *Info-Hold, Inc. v. Applied*

*Media Technologies Corp.*, 783 F.3d 1262, 1266 (Fed. Cir. 2015) (citing *Thorner v. Sony*

*Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir.2012)).

Neither circumstance exists here.  Read in both its immediate context and against the

backdrop of the patent as a whole, the term "and" in Claim 16 means, quite simply, "and," not

"or."  Claim 16 requires that the means for inputting be capable of receiving input from both a

computer *and* a telephone, and that the system have two means of outputting data:  via the

internet, and by fax, over a telephone line.

"Patent infringement requires that every element and limitation in a correctly construed

claim is embodied in the accused system ... ."  *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380

(Fed. Cir. 2007).  In the case at bar, it is undisputed that Medtronic's CareLink system lacks a

means to transmit patient data by telephone (such as by fax).  Plaintiff's own expert, Bryan P.

Bergeron, has acknowledged that fact.  *See* Bergeron Depo. Tr. (Dkt. #135-2, Ex. 14 at 235, line

14 (stating, "That's my understanding" that the CareLink system does not support the capability

of inputting raw data by telephone); *id.* at 236, lines 9-10 ("no phones are involved in the

Medtronic system"); *see also* Defendant's Statement of Undisputed Material Facts (Dkt. #135-1)

¶¶ 26, 27 (stating that it is undisputed that the Carelink system lacks the means to receive or

transmit data by telephone or fax); Medgraph Counterstatement of Material Facts (Dkt. #141-1)

¶¶ 26, 27 (admitting the truth of those assertions).  I find as a matter of law, therefore, that

defendant's CareLink system does not infringe Claim 16 of the '124 Patent.


## CONCLUSION


Defendant's motion for summary judgment (Dkt. #135) is granted, and the complaint is

dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       June 29, 2015.